UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANETTE DUBUISSON, and ALICE LACKS,
Individually and On Behalf of All Others
Similarly Situated,

                              Plaintiffs,


            - against -


NATIONAL UNION FIRE INSURANCE OF
PITTSBURGH, P.A., AMERICAN
INTERNATIONAL GROUP, INC.,
CATAMARAN HEALTH SOLUTIONS, LLC,
F/K/A CATALYST HEALTH SOLUTIONS,
INC., F/K/A HEALTHEXTRAS, INC.,
ALLIANT SERVICES HOUSTON, INC.,
F/K/A JLT SERVICES CORPORATION,
STONEBRIDGE LIFE INSURANCE
COMPANY, F/K/A J.C. PENNEY
LIFEINSURANCE COMPANY,
TRANSAMERICA FINANCIAL LIFE
INSURANCE COMPANY, FEDERAL
INSURANCE COMPANY, A MEMBER OF
THE CHUBB GROUP OF INSURANCE
COMPANIES, and VIRGINIA SURETY
COMPANY, INC.,

                              Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 2259 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

This is a putative class action brought by Plaintiffs who purchased accident

disability and medical expense insurance coverage provided by Defendants National Union Fire

Insurance Company, American International Group, Inc., Catamaran Health Solutions, LLC,

Stonebridge Life Insurance Company, Transamerica Financial Life Insurance Company, Federal

Insurance Company, Alliant Services, and Virginia Surety Company, Inc. through the

"HealthExtras Program."  The Complaint pleads (1) quasi-contract claims; (2) violations of

New York General Business Law ("GBL") §§ 349-350; and (3) fraud, fraud in the inducement,

and aiding and abetting fraud.  Plaintiffs seek the recovery of all premiums and fees they paid to Defendants in connection with the insurance coverage they purchased.

On September 19, 2016, this Court granted Defendants' first motion to dismiss, finding that Plaintiffs lack standing.  (Dkt. No. 141)  On April 12, 2018, the Second Circuit vacated and remanded, ruling that Plaintiffs have standing.  (Dkt. Nos. 151, 152)

Defendants Stonebridge Life Insurance Company and Transamerica Financial Life Insurance Company (collectively "Stonebridge") have again moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 166)  For the reasons stated below, the motion will be granted.

## BACKGROUND[1]

### I.   FACTS

#### A.   Parties

Plaintiffs Alice Lacks and Manette DuBuisson reside in Brooklyn.[2]  (Cmplt. (Dkt. No. 1) ¶¶ 6-7)

Defendant Stonebridge Life Insurance Company is a Vermont corporation, and Defendant Transamerica Financial Life Insurance Company is a New York corporation.[3]  (Id. ¶¶ 12-13)  Both entities are subsidiaries of Transamerica Life & Protection, and both are licensed as insurance companies and/or underwriters in New York and the United States.  (Id.)

---

[1]  The facts discussed below are drawn from the Complaint and are presumed true for purposes of resolving Stonebridge's motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[2]  Plaintiff George Gonzales' claims were dismissed on January 31, 2019, pursuant to Fed. R. Civ. P. 25(a)(1), because no motion for substitution was made within 90 days of Plaintiffs' service of a statement noting Gonzales' death.  (See Jan. 31, 2019 order (Dkt. No 178) at 2)

[3]  All Defendants other than Stonebridge Life Insurance Company and Transamerica Financial Life Insurance Company have been voluntarily dismissed from this action.  (Dkt. Nos. 136, 160, 180)

**B.**     **The HealthExtras Program**

In 1997, HealthExtras, Inc. (now known as "Catamaran Health Solutions, LLC," hereinafter "HealthExtras") created an insurance program (the "HealthExtras Program") that offered accidental disability and medical expense insurance coverage.  (Id. ¶¶ 10, 33)  The HealthExtras Program offered "(1) $1,000,000 or $1,500,000 accidental permanent and total disability insurance coverage; and (2) $2,500 emergency accident and sickness medical expense insurance coverage."  (Id. ¶ 33)

HealthExtras entered into marketing agreements with VISA- and MasterCard-issuing banks, including Citibank, Capital One, and Chase, with American Express, and with companies that offer branded credit cards, such as J.C. Penney, Sears and Conoco Phillips.  (Id. ¶ 36)  HealthExtras' marketing partners sent solicitations for the HealthExtras Program with cardholders' monthly credit card statements.  (Id. ¶ 39)  For example, American Express sent its cardholders a solicitation (the "American Express Solicitation") stating:  "Financial Security. You're covered with $1.5 Million if an accident leaves you permanently disabled."  (Id. ¶ 40) This solicitation went on to state that

> [t]he American Express Accidental Disability Plan provides you with $1.5 million in one lump sum if you are permanently disabled as the result of an accident and can't return to work.  For only $9.95 a month, you can help guarantee your financial security now and into the future. . . . With the American Express Accidental Disability Plan you can prevent a personal tragedy from becoming a financial tragedy.  Enroll now, and for only $9.95 a month, you can rest assured that you are protected.

(Id.)

The American Express Solicitation includes images of the actor Christopher Reeve using a tracheotomy tube.  HealthExtras had hired Reeve to endorse the HealthExtras program.  (Id. ¶ 33)  The solicitation warns that,

[i]n an instant, an accident can change your life.  Now, it doesn't have to bankrupt you; Modern medicine can save your life – don't let it bankrupt your family; and Most people don't think about disability coverage until it's too late.  Please don't put this off.

(Id. ¶ 40)  Plaintiffs allege that HealthExtras' other marketing partners sent solicitations to their cardholders "that were very similar to, if not identical to, the American Express Solicitation."

(Id. ¶ 41)  HealthExtras also solicited consumers via telephone and direct mail.  (Id. ¶ 42)

Customers who expressed interest in the HealthExtras Program were sent letters containing the following representations:

- Enclosed please find the HealthExtras program description you requested. Because lives change in an instant, like Christopher Reeve's, HealthExtras was created to provide families with financial security should the unthinkable happen.

- $1,000,000 [or $1,500,000] cash payment if you are permanently disabled due to an accident.  And as a HealthExtras member, you have two tax-free options:  a $1,000,000 lump sum cash payment or a $250,000 cash payment plus $5,000 per month for 20 years.

- $2,500 a year in reimbursements for coinsurance and deductibles for healthcare expenses when you are traveling.

(Id. ¶ 43) (alterations in Cmplt.)  Plaintiffs allege that HealthExtras – "in concert and conspiracy" with the other Defendants, including Stonebridge – sent New York residents direct mail solicitations with the following misleading statements:

- This program provides valuable protection in the event you become permanently totally disabled due to an accident.

- This HealthExtras Benefit Program provides you with a $1,000,000 [or $1,500,000] tax free cash payment if you're permanently disabled due to an accident.

- If an accident leaves you the primary member permanently disabled, you will receive a lump sum payment of $1,000,000 [or $1,500,000].

- After 12 months of continuing and permanent disability caused by an accident including the inability to work the primary member will receive a payment of $1,000,000 [or $1,500,000].

- You're covered with a $1,000,000 [or $1,500,000] tax free cash payment if you are permanently disabled as a result of an accident.

(Id. ¶ 44) (alterations in Cmplt.)

Because HealthExtras is not a licensed insurer or broker, it contracted with insurance companies to underwrite and issue the HealthExtras Program policies, with Stonebridge and other Defendants underwriting and issuing the disability insurance coverage. (Id. ¶¶ 48, 59)

The Complaint alleges that Defendants "knew that HealthExtras was not a licensed insurance broker or insurer and could not legally solicit, sell, issue or underwrite the Disability Coverage and Medical Expense Coverage under the . . . HealthExtras Program[,]" and "were [also] aware of the identity and roles of HealthExtras' Marketing Partners, including . . . American Express, CitiBank, Chase, Capital One and other issuers of credit cards."  (Id. ¶¶ 53, 59)  According to Plaintiffs, Defendants also "knew . . . at all times [that] there was no intent to pay claims on coverage under . . . the HealthExtras Program without a claimant first bringing suit."  (Id. ¶ 61)

According to the Complaint, HealthExtras

(1) prepar[ed] all of the materials necessary to promote the HealthExtras Program, (2) sen[t] HealthExtras Program marketing and advertising materials, which were reviewed and approved by the HealthExtras Program's insurers, brokers and Marketing Partners, to the Marketing Partners for transmission to the Marketing Partners' customers, (3) process[ed] enrollment forms and change of address forms received from members of the HealthExtras Program, (4) sen[t] HealthExtras Program marketing and advertising materials (including plan summaries, benefit plan descriptions and certificates of insurance), which were reviewed and approved by the insurers and brokers, to members of the HealthExtras Program, (5) process[ed] payments for premiums and fees received from members of the HealthExtras Program, (6) operat[ed] a call center to handle

customer service calls, conforming all communications regarding benefits to scripts reviewed and approved by the insurers and Marketing Partners, and (7) sen[t], upon request, claims forms to members of the HealthExtras Program on behalf of the insurers and any claims processors designated by the insurers.

(Id. ¶ 54)

According to Plaintiffs, Stonebridge and the other Defendants "had the right to, and did, review and approve all written materials related to the HealthExtras Program, as well as communications relating to the HealthExtras Program and the coverage under the underlying Policies . . . ."  (Id. ¶ 55)

### C.   Alleged Violations of New York Insurance Law

Plaintiffs contend that the insurance policies issued in connection with the HealthExtras Program violate New York insurance laws and regulations, rendering the policies "illegal, against public policy and void ab initio under New York law."  (Id. ¶ 3)

According to Plaintiffs, the HealthExtras Program's disability and medical insurance coverage was provided under (1) "group and/or blanket accident disability insurance policies[,]" and (2) "group and/or blanket emergency accident and sickness medical expense policies" issued by the defendant insurers.  (Id. ¶ 59)  "Group and blanket insurance policies differ from individual insurance policies in that a single master insurance policy is issued to an eligible entity, as opposed to the individual persons being insured.  Thus, the eligible entity is the actual policyholder."  (Id. ¶ 19)

Plaintiffs contend that the insurance policies issued in connection with the HealthExtras Program "were not issued to groups or entities eligible to be issued such policies under N.Y. Ins. Law § 4235 and § 4237 . . . , and 11 CRR-NY 52.70" (id. ¶ 3), and that Defendants knew that these policies had been issued to ineligible groups, such as the AIG Group Insurance Trust and HealthExtras.  (Id. ¶ 62)  Plaintiffs further allege that the consumers

who purchased insurance coverage under the HealthExtras Program "were not actual members of or a part of any eligible groups or entities, but rather merely credit card holders and other individuals to whom Defendants had easy access to market the coverage."  (Id. ¶ 3; see also id. ¶ 106 ("The lack of any connection between Plaintiffs and the other members of the Class and AIG Insurance Trust or HealthExtras is further evidence that the [p]olicies purportedly providing them with insurance coverage were not issued to eligible entities as required by N.Y. Ins. Law §§ 4235 and 4537 . . . and 11 CRR-NY 52.70."))

Plaintiffs contend that if an "entity . . . authorized to be issued group and blanket accident and health insurance policies ever reviewed the [HealthExtras] Policies, they very likely would never have been approved, issued and coverage under them sold to Plaintiffs and the Class members."  (Id. ¶ 110)

The Complaint further alleges that the "policies were not filed with and approved by the Superintendent of New York's Department of Insurance (now known as the Department of Financial Services) as required by N.Y. Ins. Law § 3201(b)(1)."  (Id. ¶ 3)  Plaintiffs claim that "[h]ad these [p]olicy forms and related individual certificates of insurance been filed, and had Defendants truthfully disclosed the proposed policyholders, it is highly likely the forms would not have been approved."  (Id. ¶ 111)

Finally, Plaintiffs allege that the policies issued in connection with the HealthExtras Program did not contain certain "standard provisions required to be included pursuant to N.Y. Ins. Law § 3221(a) or alternative provisions that were approved . . . as being as or more favorable [to purchasers] than the standard provisions[.]"  (Id. ¶ 69; see also id. ¶ 3) For example, insurers are required to disclose "'[t]he conditions under which the insurer may decline to renew the policy[.]'"  (Id. ¶ 69 (quoting N.Y. INS. LAW § 3221(a)(5)))  According to

7

Plaintiffs, the failure to include such provisions renders the HealthExtras Program's "policies less favorable to [the] insureds . . . than [is] required by New York law." (Id. ¶ 112)

> ### D.   <u>Alleged Illusory Coverage</u>

Plaintiffs also contend that the policies underlying the HealthExtras Program are drafted so as to "make illusory the insurance coverage supposedly provided." (Id. ¶ 113) For example, the policies' accidental disability benefits provisions provide:

> 1.  Loss shall mean:
>
>    a.   total and permanent Loss of Use of both hands or both feet;
>
>    b.   total and permanent Loss of Use of one hand and one foot;
>
>    c.   total and permanent Loss of sight in both eyes;
>
>    d.   total and permanent Loss of speech;
>
>    e.   total and permanent Loss of hearing in both ears; and
>
> 2.  Loss of Use means actual severance through or above a wrist or ankle or total paralysis of a limb or limbs which is determined by a competent medical authority to be permanent, complete and irreversible.

(Id. ¶ 114)

According to Plaintiffs, the likelihood of any such loss is "staggeringly remote." (Id. ¶ 115) Although Plaintiffs "do not base their claims upon the unfair terms of the [p]olicies" (id. ¶ 113), Plaintiffs contend that the "terms of the [p]olicies illustrate how the review of group or blanket health and accident policies by both the Department of Insurance and the type of entity or group to which New York Law allows such policies to be issued . . . potentially serves to protect individuals from payment of premiums for policies with illusory coverage that are of essentially no value." (Id. ¶ 117)

According to the Complaint, Defendants terminated the HealthExtras Program and all associated insurance coverage after "[f]acing litigation in multiple states concerning the illegality of the purported insurance policies . . . ."  (Id. ¶ 118)

## II.  THE COMPLAINT'S CAUSES OF ACTION

The Complaint asserts (1) quasi-contract claims; (2) violations of GBL §§ 349 and 350; and (3) fraud, fraud in the inducement, and aiding and abetting fraud claims.  (Id. ¶ 4)

As to quasi-contract, Plaintiffs allege that "Defendants were [unjustly] enriched at Plaintiffs' . . . expense," because they sold "insurance coverage . . . that was illegal, against public policy, and void ab initio . . . ."  (Id. ¶¶ 159-60)  Plaintiffs contend that they are entitled to recover all premiums paid – even if the "coverage . . . is not void ab initio, but rather is merely voidable due to illegality" – because "(a) Plaintiffs . . . are members of the class of persons meant to be protected by the statutes and regulations violated by Defendants, and/or (b) because Defendants are 100% responsible for the violation of the New York insurance statutes and regulations, making them entirely culpable for . . . the illegality of the [p]olicies."  (Id. ¶ 162)

The Complaint further asserts that "Defendants' marketing to, sale to, issuance of and collection of premiums or fees from Plaintiffs . . . in connection with coverage under the [p]olicies violated N.Y. Gen. Bus. L. § 349," which "makes unlawful 'deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.'"  (Id. ¶ 169 (quoting GBL § 349(a)))  Plaintiffs cite a number of alleged deceptive acts and practices, including (1) the creation and distribution of marketing materials; (2) the issuance of certificates of insurance and other insurance coverage documentation; (3) the listing of ineligible entities as policyholders; and (4) the collection of insurance premiums.  (Id. ¶ 171)

In connection with these acts and practices, Defendants falsely represented that the HealthExtras Program insurance coverage was "legal under New York law, not against public policy, was issued to real, valid and eligible policyholders, was not void <u>ab</u> <u>initio</u> or voidable, [and] provided real and valuable insurance coverage . . . ." (<u>Id.</u>)  Defendants also falsely represented that they "would pay claims falling within the terms of the purported [p]olicies without first being sued." (<u>Id.</u>)

According to Plaintiffs, Defendants also did not make the following necessary disclosures:

> (a) that HealthExtras created and all Defendants participated in a program pursuant to which unsuspecting credit card holders and others were targeted for what appeared to be beneficial low cost group and/or blanket accident and health insurance policies, (b) that HealthExtras agreed with the other Defendants that they would issue group and/or blanket accident and health insurance policies to entities ineligible to be issued group and/or blanket insurance policies under New York law, (c) that HealthExtras agreed with the other Defendants that they would issue insurance coverage under group and/or blanket accident and health insurance policy forms that were not filed with and approved by the Superintendent of New York's Department of Insurance as required by New York law, (d) that HealthExtras agreed with National Union, AIG, and Alliant that they would issue insurance coverage under group and/or blanket accident and health insurance policy forms that did not contain provisions required by New York law, (e) that the coverage under those Policies purchased by Plaintiffs and the Class members as part of the HealthExtras Program was illegal, against public policy, and either void <u>ab</u> <u>initio</u> or subject to being deemed void under New York law and were thus valueless, (f) that the coverage purchased by Plaintiffs and the Class members had not been reviewed or vetted by any eligible entity or group with a vested interest in insuring the quality, fairness and merits of such coverage, and (g) that HealthExtras and the other Defendants had agreed that claims falling within the terms of the purported [p]olicies would not be paid unless Class members filed suit.

(<u>Id.</u> ¶ 172)

Plaintiffs contend that these same misrepresentations and omissions constitute (1) "false advertising" under GBL § 350 (<u>id.</u> ¶¶ 179, 182); and (2) fraud, fraud in the inducement, and aiding and abetting fraud under New York law.  (<u>Id.</u> ¶¶ 189-90)

Stonebridge has moved to dismiss all of Plaintiffs' claims.  (Dkt. No. 166)

**DISCUSSION**

I.      **MOTION TO DISMISS STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citation omitted), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions[] are not entitled to the assumption of truth[,]" however.  Iqbal, 556 U.S. at 679.  A pleading is conclusory "if it tenders 'naked assertion[s] devoid of 'further factual enhancement[,]'" offers "'a formulaic recitation of the elements of a cause of action,'" id. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Iqbal, 556 U.S. at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir.

1999)).  "Where a document is not incorporated by reference, the court may never[the]less

consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the

document 'integral' to the complaint."  Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391,

398 (2d Cir. 2006)).

## II.    STATUTE OF LIMITATIONS

Stonebridge contends that all of Plaintiffs' claims are time-barred, because

"plaintiffs were aware of all facts underlying the alleged misrepresentations and omissions [] at

the time plaintiffs first received coverage [in 2000]."  (Def. Br. (Dkt. No. 167) at 20)[4]

### A.    GBL Claims

Under New York law, a six-year statute of limitations governs "an action for

which no limitation is specifically prescribed by law[.]"  N.Y. C.P.L.R. § 213(1) (McKinney

2019).  Stonebridge contends, however, that N.Y C.P.L.R. § 214(2)'s three-year limitations

period governs Plaintiffs' GBL claims, because that provision applies to "'an action to recover

upon a liability, penalty or forfeiture created or imposed by statute . . . .'"  (Def. Br. (Dkt. No.

167) at 20-21 (quoting N.Y. C.P.L.R. § 214(2) (McKinney 1996)))  According to Stonebridge,

Section 214(2) applies to Plaintiff's GBL claims, because these claims "'would not exist but for

a statute.'"  (Id. at 21 (quoting Gaidon v. Guardian Life Ins. Co. of Am., 96 N.Y.2d 201, 208

(2001)).

This Court concludes that Plaintiffs' GBL claims are time-barred under either

provision, because Plaintiffs' claims arise from insurance policies that were purchased in 2000,

fifteen years before the Complaint was filed.  (Cmplt. (Dkt. No. 1) ¶¶ 85, 90)  Plaintiffs offer

---

[4]  The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

several arguments as to why their GBL claims are not time-barred.  None of these arguments is persuasive.

### 1.  Continuing Wrong Doctrine

Plaintiffs cite the "doctrine of continuing wrong," which "tolls a limitations period up to the date of the commission of the last wrongful act."  (Pltf. Opp. Br. (Dkt. No. 168) at 22-23 (citing Shelton v. Elite Model Mgmt., Inc., 11 Misc. 3d 345 (N.Y. Cty. Sup. Ct. 2005), abrogated on other grounds, Rhodes v. Herz, 84 A.D.3d 1, 7 (1st Dept. 2011)))  They argue that the continuing wrong doctrine applies to their GBL causes of action because "Stonebridge had an ongoing duty pursuant to New York Insurance Law §§ 3201, 3221, 4235 & 4237 not to purport to provide coverage under or collect premiums pursuant to group or blanket accident and health insurance policies that violated those statutes[,]" and thus, "Stonebridge violated the law every day it did not cancel the purported [p]olicies and each and every time it collected premiums from Plaintiffs."  (Id. at 24)

"'Where a [GBL] § 349 claim is based on a series of allegedly deceptive acts, . . . the continuing violations doctrine applies and effectively tolls the limitations period until the date of the commission of the last wrongful act.'"  Stanley v. Direct Energy Servs., LLC, 466 F. Supp. 3d 415, 432 (S.D.N.Y. 2020) (quoting Breitman v. Xerox Educ. Servs., LLC, No. 12 Civ. 6583(PAC), 2013 WL 5420532, at *4 (S.D.N.Y. Sept. 27, 2013)) (internal quotation marks omitted).  However, "New York courts have explained that tolling based on the doctrine 'may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct[.]'"  Miller v. Metro. Life Ins. Co., 979 F.3d 118, 122 (2d Cir. 2020) (quoting Salomon v. Town of Wallkill, 174 A.D.3d 720, 721 (2d Dept. 2019)).  "The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs[.]"  Henry v. Bank of Am., 147 A.D.3d 599, 601 (1st Dept. 2017) (citations omitted).

Plaintiffs contend that <u>Harvey v. Metropolitan Life Insurance Co.</u>, 21 Misc. 3d 1142(A), 2005 N.Y. Slip Op. 52397(U) (N.Y. Sup. Ct. 2005), <u>aff'd</u>, 34 A.D.3d 364 (1st Dept. 2006), supports application of the continuing wrong doctrine to their GBL claims.  In <u>Harvey</u>, plaintiff purchased from defendant Metropolitan Life Insurance Company ("MetLife") a life insurance policy that included a "Child Rider, . . . [which] insured Harvey's children until they reached the age of 25."  <u>Harvey</u>, 2005 N.Y. Slip Op. 52397(U), at *1.  MetLife continued to charge plaintiff for the Child Rider after his children reached age 25, "despite the fact that none of his children were eligible for coverage during that period of time."  <u>Id.</u> at *2.  Harvey argued that the continuing wrong doctrine applied to his GBL § 349 claim because MetLife's "deceptive behavior occurred each month that MetLife [charged Plaintiff] . . . for coverage that was not being provided, and . . . the limitations period accrued anew with each improper [charge]."  The court agreed, finding that each payment toward the Child Rider after the coverage for his children expired "constituted an unlawful act."  <u>Id.</u> at *4.

The circumstances here are distinguishable from those in <u>Harvey</u>, because Plaintiffs have not alleged that a separate and distinct wrong occurred each time they paid premiums.  Plaintiffs instead allege a wrong that occurred when they first purchased the policies – namely, that the policies were sold through false and misleading advertising.  (Cmplt. (Dkt. No. 1) ¶¶ 171-72, 181-82)  After the policies were sold to Plaintiffs – allegedly through false and misleading advertising – Defendants took no action beyond continuing the coverage.  While Plaintiffs argue that Stonebridge "violated the law every day it did not cancel the purported Policies and each and every time it collected premiums from Plaintiffs" (Pltf. Opp. Br. (Dkt. No. 168) at 24), these wrongs are merely "'the continuing effects of earlier unlawful conduct.'" <u>Miller</u>, 979 F.3d at 122 (quoting <u>Salomon</u>, 174 A.D.3d at 721).

14

Plaintiffs' reliance on Shelton is likewise misplaced.  In Shelton, plaintiffs brought GBL § 349 claims against modeling agencies.  Plaintiffs contended that the modeling agencies had improperly taken the position that they were not employment agencies under New York law, and thus were not subject to the statutory ten percent limit applicable to employment agency fees under GBL § 185.  See Shelton, 11 Misc. 3d at 349.  The court ruled that the statute of limitations had been tolled under the continuing violations doctrine "each time plaintiffs paid defendants more than the statutory 10% fee," because each overpayment constituted a violation of Section 349.  Id. at 361.  Here, as discussed above, Plaintiffs contend that they suffered harm as a result of false and misleading advertising that induced them to purchase the insurance policies in the first place.  The monthly premiums are merely "'continuing effects of earlier unlawful conduct.'"  Miller, 979 F.3d at 122 (quoting Salomon, 174 A.D.3d at 721).[5]

In contrast to the cases cited by Plaintiff, the facts in Pike v. New York Life Insurance Co., 72 A.D.3d 1043 (2d Dept. 2010), are analogous to those here.  In Pike, plaintiffs brought fraud and GBL § 349 claims, alleging that they had been "induced to purchase unsuitable [insurance] policies, and . . . were unaware that they would have to pay 'substantial'

---

[5]  Plaintiffs' remaining authorities are distinguishable for the same reason.  In Kaymakcian v. Bd. of Managers of the Charles House Condo., 49 A.D.3d 407 (1st Dept. 2008), the court applied the continuing wrong doctrine where there were "recurring leaks" about which plaintiffs "repeatedly notified" the defendants, which did not fix them.  Because defendants "had a continuing duty to repair the building's limited common elements" under the condominium's bylaws, defendants' failure to make the repairs constituted a continuing wrong.  Kaymakcian, 49 A.D.3d at 407.  In Orville v. Newski, Inc., 155 A.D.2d 799 (3rd Dept. 1989), the court found that a contractual obligation to make a certain minimum payment "remained in full force and effect" throughout the multi-year term of the contract.  Accordingly, "each year in which the defendant failed to make the minimum payment" constituted a new breach of contract.  Orville, 155 A.D.2d at 801.  Finally, in 78/79 York Assocs. v. Rand, 175 Misc. 2d 960 (N.Y. Civ. Ct. 1998), the court addressed "a cause of action for rent overcharge," concluding that "a cause of action accrue[d] anew with each month's payment of [a] rent [overcharge.]"  78/79 York Assocs., 175 Misc. 2d at 966.

15

premiums. . . ." <u>Pike</u>, 72 A.D.3d at 1048.  Plaintiffs argued that the continuing wrong doctrine applied, because the defendant continued to collect premiums from plaintiffs.  The court rejected plaintiffs' argument, because plaintiffs "[did] not point to any specific wrong that occurred each time they paid a premium, other than having to pay it."  The court ruled that "any wrong accrued at the time of purchase of the policies, not at the time of payment of each premium[.]"  <u>Id.</u>

The same logic applies with equal force here, where Plaintiffs' statute of limitations arguments are premised on their monthly premium payments.  <u>See also</u> <u>Ramiro Aviles v. S & P Glob., Inc.</u>, 380 F. Supp. 3d 221, 289 (S.D.N.Y. 2019) (continuing wrong doctrine not applicable where "each plaintiff's fraud claim was complete at the time of investment," although damages increased over time); <u>Quintana v. Wiener</u>, 717 F. Supp. 77, 80 (S.D.N.Y. 1989) ("[Plaintiff's] allegations of fraud rest upon the documents [defendant] filed in 1975 and 1976, and the monthly rent [defendant] established in 1977.  The subsequent rent payments [plaintiff] made, if improper, amount only to damages stemming from this initial fraud."); <u>Henry</u>, 147 A.D.3d at 602 (continuing wrong doctrine not applicable to plaintiff's fraud, GBL, and other claims where plaintiff alleged that he was improperly enrolled in credit programs and then charged monthly program fees; "the alleged wrongs [were] the enrollment of plaintiff in the . . . programs," and the monthly fees "represent[ed] the consequences of those wrongful acts in the form of continuing damages, not the wrongs themselves").

Because the alleged deceptive and false advertising took place when the policies were sold, and because Plaintiffs have not alleged that they suffered injury by virtue of false and misleading advertising issued thereafter, the continuing wrong doctrine does not apply.

## 2.      **Equitable Tolling**

Plaintiffs contend that "equitable tolling applies to prevent the running of

limitations on all of Plaintiffs' causes of action," because "the defendant made

misrepresentations and omissions in connection with the wrongdoing that were calculated to

leave the plaintiff in ignorance of his causes of action."  (Pltf. Opp. Br. (Dkt. No. 168) at 24-25)

(citations omitted)

"Under New York law, the doctrines of equitable tolling or equitable estoppel

'may be invoked to defeat a statute of limitations defense when the plaintiff was induced by

fraud, misrepresentations or deception to refrain from filing a timely action.'"[6]  Abbas v. Dixon,

---

[6]  New York courts do not differentiate between equitable tolling and equitable estoppel.  See
Pearl v. City of Long Beach, 296 F.3d 76, 82-83 (2d Cir. 2002) ("New York appears to use the
label 'equitable estoppel' to cover both the circumstances where the defendant conceals from the
plaintiff the fact that he has a cause of action [and] where the plaintiff is aware of his cause of
action, but the defendant induces him to forego suit until after the period of limitations has
expired.") (internal quotation marks and citation omitted); Fertitta v. Knoedler Gallery, LLC,
No. 14-CV-2259 (JPO), 2015 WL 374968, at *8 n.6 (S.D.N.Y. Jan. 29, 2015) ("New York does
not distinguish between equitable tolling and equitable estoppel." (citing Meridien Int'l Bank
Ltd. v. Gov't of the Republic of Liber., 23 F. Supp. 2d 439, 446 n.4 (S.D.N.Y. 1998))); 
Statistical Phone Philly v. NYNEX Corp., 116 F. Supp. 2d 468, 484 (S.D.N.Y. 2000), aff'd sub
nom. Black Radio Network, Inc. v. Nynex Corp., 14 F. App'x 111 (2d Cir. 2001) ("[U]nder
New York law, the doctrines of equitable tolling and fraudulent concealment [(equitable
tolling)] are analyzed in the same manner[.]"); see also Corp. Trade, Inc. v. Golf Channel, 563
F. App'x 841, 841-42 (2d Cir. 2014) (summary order) ("Although CTI argues for both equitable
estoppel and equitable tolling on appeal, New York law does not distinguish between the
doctrines and applies the same analysis." (citing Abbas, 480 F.3d at 642; In re Fischer, 308 B.R.
631, 656 (Bankr. E.D.N.Y. 2004))).

Although Stonebridge contends that equitable tolling does not apply to the state law causes of
action at issue here (see Def. Reply (Dkt. No. 174) at 14, 14 n.6), the weight of authority is to
the contrary.  See, e.g., Long v. Frank, 22 F.3d 54, 58 (2d Cir. 1994) ("The doctrine of equitable
tolling 'was developed in the context of actions based on fraud,' but 'has been applied in cases
alleging causes of action other than fraud where the facts show that the defendant engaged in
conduct, often itself fraudulent, that concealed from the plaintiff the existence of the cause of
action.'" (quoting Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir.
1985))); City of Almaty v. Sater, 503 F. Supp. 3d 51, 66-68 (S.D.N.Y. 2020) (question of fact as
to whether equitable estoppel applied to unjust enrichment claim precluded dismissal on
timeliness grounds); Dist. Attorney of N.Y. Cty. v. Republic of the Phil., 307 F. Supp. 3d 171,

---

202-04 (S.D.N.Y. 2018) (same); Wiedis v. Dreambuilder Invs., LLC, 268 F. Supp. 3d 457, 467 (S.D.N.Y. 2017) ("[C]ommon law fraud permits a plaintiff to 'file his or her claim outside the applicable limitations period' under the doctrine of equitable tolling 'if, because of some action on the defendant's part, the complainant was unaware that the cause of action existed.'" (quoting Long, 22 F.3d at 58)); Martin Hilti Family Tr. v. Knoedler Gallery, LLC, 137 F. Supp. 3d 430, 470-71 (S.D.N.Y. 2015) (considering merits of equitable tolling argument in connection with GBL §§ 349-50, unjust enrichment, breach of warranty, and mistake claims); Statler v. Dell, Inc., 841 F. Supp. 2d 642, 647-48 (E.D.N.Y. 2012) (considering merits of equitable tolling argument in connection with GBL § 349 claim); Int'l Bhd. of Teamsters Local 456 Health & Welfare Tr. Fund v. Quest Diagnostics Inc., No. 10-CV-1692 (RJD), 2012 WL 13202126, at *13 (E.D.N.Y. Apr. 19, 2012) (considering merits of equitable tolling argument in connection with GBL § 349, unjust enrichment, and breach of warranty claims); Council v. Better Homes Depot, Inc., No. 04 CV 5620 NGG KAM, 2006 WL 2376381, at *11 (E.D.N.Y. Aug. 16, 2006), adhered to on denial of reconsideration, No. 04 CV 5620 (NGG)(KAM), 2007 WL 680768 (E.D.N.Y. Mar. 2, 2007) (finding GBL § 349 claim timely after application of equitable tolling doctrine).

Moreover, the cases cited by Stonebridge (see Def. Reply (Dkt. No. 174) at 14, 14 n.6) involve causes of action not at issue here. See Fairley v. Collins, No. 09 Civ. 6894(PGG), 2011 WL 1002422, at *4-5 (S.D.N.Y. Mar. 15, 2011) (finding equitable tolling inapplicable to 42 U.S.C. § 1983 claim); In the Matter of King v. Chmielewski, 76 N.Y.2d 182, 187 (1990) (holding that there is no statutory authority for tolling claims brought under New York Town Law § 276). In Von Hoffman v. Prudential Insurance Co. of America, 202 F. Supp. 2d 252 (S.D.N.Y. 2002), the court held that the federal equitable tolling doctrine applies only to "federally created causes of action," and therefore did not apply to plaintiffs' claims for negligence and violation of New York Insurance Law § 2123. Von Hoffman, 202 F. Supp. 2d at 264. Von Hoffman relies on Department of Economic Development v. Arthur Andersen & Co. (U.S.A.), 747 F. Supp. 922, 943 (S.D.N.Y. 1990), which in turn cites Ingenito v. Bermec Corp., 441 F. Supp. 525, 553 n.26 (S.D.N.Y. 1977). But Ingenito does not address whether equitable tolling applies to state law causes of action. Ingenito instead addresses a claim under the Securities and Exchange Act of 1933, and holds that "[s]ince actions under § 12(1) [of the Securities and Exchange Act of 1933] are not themselves in the nature of fraud, plaintiffs must point to action by [defendant] which fraudulently concealed their claim in order to take advantage of equitable tolling. This they have not done. . . ." Ingenito, 441 F. Supp. at 553 n.26. In any event, Von Hoffman is not on point, because the instant action does not involve claims for negligence or for violation of New York Insurance Law § 2123. In Giordano v. Coll. of Staten Island, No. 102603/10, 2011 WL 2991745 (Richmond Cty. Sup. Ct. July 22, 2011), the court held that equitable tolling did not apply to plaintiff's claim under New York Civil Service Law § 75-b, because there is "no recognized applicable [equitable tolling] doctrine in New York" and plaintiff had not shown that the delay in filing his claim was caused by an "action of defendant." Id. at *1. The instant case does not involve a claim under the Civil Service Law, and Giordano is not persuasive in light of the authority discussed above.

480 F.3d 636, 642 (2d Cir. 2007) (quoting Holy See (State of Vatican City), 17 A.D.3d 793, 794

(3rd Dept. 2005)).  "Whether referred to as 'equitable tolling,' or 'equitable estoppel,' tolling is

applied only in rare circumstances when the defendant's fraudulent conduct either conceals the

existence of a cause of action or acts to delay Plaintiff from commencing a lawsuit."  Statler,

841 F. Supp. 2d at 647-48 (citing Pearl, 296 F.3d at 82; Chmiel v. Potter, No. 09–CV–

555(RJA), 2010 WL 5904384, at *9 (W.D.N.Y. Dec. 7, 2010); Torre v. Columbia Univ., No. 97

Civ. 0981(LAP), 1998 WL 386438, at *6 (S.D.N.Y. July 10, 1998)); see also N.Y. State

Workers' Comp. Bd. v. Fuller & LaFiura, CPAs, P.C., 146 A.D.3d 1110, 1116 (3d Dept. 2017)

(noting that equitable estoppel is an "'extraordinary remedy'" (quoting City of Binghamton v.

Hawk Eng'g P.C., 85 A.D.3d 1417, 1420 (3d Dept. 2011))).  A plaintiff seeking equitable

tolling "must establish that 'the defendant wrongfully concealed material facts,' which

'prevented plaintiff's discovery of the nature of the claim,' and that 'plaintiff exercised due

diligence in pursuing the discovery of the claim during the period plaintiff seeks to have

tolled.'"  Marshall v. Hyundai Motor Am., 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2014) (quoting

Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012)).

> "'Due diligence on the part of the plaintiff in bringing [an] action,' . . . is an

essential element of equitable relief. . . . The plaintiff bears the burden of showing that the

action was brought within a reasonable period of time after the facts giving rise to the equitable

tolling or equitable estoppel claim 'have ceased to be operational.'"  Abbas, 480 F.3d at 642

(quoting Holy See, 17 A.D.3d at 796).  "[I]n no event will the plaintiff be found to have

exercised the required diligence if his action is deferred beyond the date which would be

marked by the reapplication of the statutory period, i.e., that the length of the statutory period

itself sets an outside limit on what will be regarded as due diligence."  Simcuski v. Saeli, 44

19

N.Y.2d 442, 450-51 (1978).  "In other words, . . . the 'outside limit' for [plaintiffs] to . . . file[]

their claims [is] three years[, i.e., the legislatively prescribed period of limitation,] from the date

upon which they discovered the relevant facts underlying their claims."  Weizmann Inst. of Sci.

v. Neschis, 421 F. Supp. 2d 654, 685 (S.D.N.Y. 2005) (citing Simcuski, 44 N.Y.2d at 450-51;

Campbell v. Chabot, 189 A.D.2d 746, 747 (2d Dept. 1993)).

        Here, most of the alleged misrepresentations and omissions are premised on

arguments that the policies have no value because they do not comply with the New York

Insurance Law and the coverage they provide is extremely limited.[7]

        Plaintiffs contend that equitable tolling applies to all of their claims because

"defendant's wrongdoing is inherently self-concealing."  (Pltf. Opp. Br. (Dkt. No. 168) at 24)

Even assuming, arguendo, that the wrongdoing Plaintiffs allege is "self-concealing," Plaintiffs

must still "show[] that the action was brought within a reasonable period of time after the facts

---

[7]  The Complaint alleges that by (1) issuing marketing materials describing the coverage under
the HealthExtras Program; (2) issuing written certificates of insurance and other documents that
(a) "acknowledged the types of coverage being provided" and "a purported agreement to pay
the benefits provided under the [p]olicies," (b) listed ineligible entities as policyholders, and (c)
contained "specific effective dates, premium amounts to be paid, limits of coverage, and
specific policy terms"; and (3) collecting and retaining premiums paid under the policies,
Stonebridge falsely represented that the policies were legal, not against public policy, and not
void or voidable, that they provided "real and valuable insurance coverage," that they were
issued to eligible policyholders, and that Defendants would pay claims under the policies without
first being sued.  (Cmplt. (Dkt. No. 1) ¶¶ 171, 181, 189)

As to omissions, the Complaint alleges that Defendants should have disclosed that (1) they were
targeting "unsuspecting credit card holders . . . for what appeared to be beneficial low cost"
accident and health insurance; (2) they had agreed to issue the policies to ineligible entities; (3)
they had agreed to issue the policies without first filing them with the Superintendent of New
York's Department of Insurance and receiving approval; (4) they had agreed to issue the
policies without including "provisions required by New York law"; (5) the policies were illegal,
against public policy, void or voidable, and "thus valueless"; (6) the policies had not been
"reviewed or vetted" by appropriate entities to ensure the quality or fairness of the coverage
provided; and (7) they had agreed not to pay claims under the policies unless a claimant filed
suit.  (Id.  ¶¶ 172, 182, 190)

giving rise to the equitable tolling or equitable estoppel claim 'have ceased to be operational.'" Abbas, 480 F.3d at 642 (quoting Doe, 17 A.D.3d at 794).

Plaintiffs concede that by 2005 – ten years before the instant lawsuit was filed – they had received the policy terms, including coverage descriptions, and "marketing materials disclos[ing] that Stonebridge's Policy was issued to a trust. . . ." (Pltf. Opp. Br. (Dkt. No. 168) at 26-27, 35 (citing Cmplt. (Dkt. No. 1) ¶¶ 77-78, 84-85, 90-91); see also Cmplt. (Dkt. No. 1) ¶ 79) Plaintiffs were thus aware – by 2005 – of the alleged "extremely restrictive coverage [terms of the [policies]," and they knew "that the [policies] had been issued to a trust." (Id. at 27) These are the core factual allegations on which Plaintiffs' claims are premised. But the Complaint does not plead facts demonstrating that Plaintiffs exercised due diligence in pursuing an inquiry regarding the "extremely restrictive coverage [terms]" and the alleged illegal issuance of the policy to a trust once these matters became known to Plaintiffs. Indeed, the Complaint pleads no facts suggesting that Plaintiffs undertook an inquiry concerning the alleged false advertising between 2005 and 2015, when this lawsuit was filed.

Equitable tolling does not apply "[i]f a plaintiff is on notice of potential wrongdoing but takes no steps to investigate further." Stuart v. Stuart, No. 12–CV–5588 (CS), 2013 WL 6477492, at *5 (S.D.N.Y. Dec. 10, 2013); see also Corp. Trade, Inc. v. Golf Channel, No. 12 Civ. 8811(PKC), 2013 WL 5375623, at *6 (S.D.N.Y. Sept. 24, 2013), aff'd, 563 F. App'x 841 (2d Cir. 2014) (holding that equitable estoppel did not apply where plaintiff "had notice of potential wrongdoing, but took no steps to further investigate [the defendant]" (citing Putter v. N. Shore Univ. Hosp., 7 N.Y.3d 548, 553-54 (2006); Neil v. City of New York, 95 A.D.3d 608, 608 (1st Dept. 2012))). Once Plaintiffs became aware that the policies had been issued to a trust and that the coverage provided was extremely restrictive, they could have

discovered through reasonable diligence that the policies violated the New York Insurance Law and offered illusory coverage, as they now allege.  But Plaintiffs have not shown that they pursued any investigation, much less a reasonably diligent one.

The Court concludes that Plaintiffs have not met their burden to show that equitable tolling applies to their claims under GBL §§ 349-50.

### 3.   **Claims Based on Void Contracts**

Plaintiffs contend that "New York law provides that limitations never run on a cause of action based upon a void contract. . . ."  (Pltf. Opp. Br. (Dkt. No. 168) at 21 (citations omitted))

New York Insurance Law § 3103(a) provides that

> any policy of insurance or contract of annuity delivered or issued for delivery in this state in violation of any of the provisions of this chapter shall be valid and binding upon the insurer issuing the same, but in all respects in which its provisions are in violation of the requirements or prohibitions of this chapter it shall be enforceable as if it conformed with such requirements or prohibitions.

N.Y. Ins. Law § 3103(a) (McKinney 2021).

Section 3103(a) is a savings clause that ensures that "[p]olicies that are inconsistent with provisions of the insurance law remain valid and binding. . . ."  This provision obligates an "insurer . . . to maintain coverage, not only for the insurance it had agreed to extend, but also for that which the law required it to extend."  In re Sept. 11th Liab. Ins. Coverage Cases, 333 F. Supp. 2d 111, 125 (S.D.N.Y. 2004) (citing N.Y. Ins. Law § 3103(a)); see also AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc., 84 F.3d 622, 624 n.1 (2d Cir. 1996) ("If . . . a provision [required by the New York Insurance Law] is not included in the policy, a court construing the policy will enforce it as if it did include the provision." (citing N.Y. Ins. Law § 3103(a))); Travelers Indem. Co. v. Northrop Grumman Corp., 956 F. Supp. 2d 494, 503 n.12 (S.D.N.Y. 2013) ("[Section 3103(a)] provides that a policy that fails to include a

provision otherwise imposed by law should be enforced as if the legally mandated provision were included."); In re Ambassador Grp., Inc. Litig., No. MDL–778(RJD), CV–85–2132(RJD), 1991 WL 11033784, at *7 (E.D.N.Y. Feb. 27, 1991) ("[I]t would be completely contrary to New York's established public policy to void an insurance policy issued in violation of [the New York Insurance Law and regulations]; rather, analogous to the procedure provided in Section 3103(a) of New York's Insurance Law, it would be more appropriate to treat the policy as binding, but construe it as if its provisions were in accord with the regulation.") (citation omitted); T.P.K. Constr. Corp. v. S. Am. Ins. Co., 752 F. Supp. 105, 111 n.8 (S.D.N.Y. 1990) ("[U]nconscionable . . . provisions do not void the Agreement[, which remains] enforceable against the insurer under § 3103(a) of the New York Insurance Law."); G.E. Capital Mortg. Servs., Inc. v. Daskal, 211 A.D.2d 613, 615 (2d Dept. 1995) ("[T]o the extent that a policy deviates from the standard policy by containing terms less favorable to the mortgagee, 'the policy is enforceable as if it conformed with the statute[.]'" (quoting 1303 Webster Ave. Realty Corp. v. Great Am. Surplus Lines Ins. Co., 63 N.Y.2d 227, 231 (1984); citing N.Y. INS. LAW §3103(a))); Metro Missions, Inc. v. US 1 Holdings, 35 Misc. 3d 1229(A), 2012 N.Y. Slip Op. 50926(U), at *5 n.2 (Kings Cty. Sup. Ct. May 24, 2012) (an insurance policy that violates the New York Insurance Law will "be deemed to provide the required coverage" pursuant to § 3103(a)); N.Y. Gen. Counsel Op. No. 7-7-2005 (#2) (July 7, 2005) ("If [a] policy is not in compliance with the Insurance Law then, pursuant to N.Y. Ins. Law § 3103(a) (McKinney 2000), the policy would be enforceable as if it conformed with any requirements or prohibitions provided in the Insurance Law.").[8]

---

[8]  Section 3103 reflects principles of New York law that have been in place for a hundred years or more.  See Metro. Life Ins. Co. v. Conway, 252 N.Y. 449, 451-52 (1930) ("If approval is omitted, the policy or the rider is not invalid ipso facto, unless in conflict with the provisions

Under New York Insurance Law § 3103(a), the policies at issue are enforceable by Plaintiffs; they are not void as a result of their alleged non-compliance with the New York Insurance Law.  See N.Y. INS. LAW § 3103(a).  Because the policies are not void, Plaintiffs' GBL claims are subject to the applicable statutes of limitation.

\*      \*      \*      \*

Because (1) Plaintiffs' GBL §§ 349-350 claims accrued no later than 2005; and (2) this action was not filed until 2015, Plaintiffs' GBL §§ 349-350 claims are time-barred. Accordingly, Stonebridge's motion to dismiss will be granted as to Plaintiffs' GBL claims.

B.    **Fraud Claims**

Plaintiffs' fraud claims are premised on the same alleged misrepresentations and omissions that provide the basis for Plaintiffs' GBL claims.  (See Cmplt. (Dkt. No. 1) ¶¶ 171-72, 181-82, 189-90)

Under New York law, a six-year statute of limitations applies to "an action based upon fraud; the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8).

In arguing that their fraud claims are timely, Plaintiffs contend that "the complaint does not establish that plaintiffs should have discovered [the fraud] more than two years prior to filing suit."  (Pltf. Opp. Br. (Dkt. No. 168) at 25)  According to Plaintiffs, they were not on inquiry notice until shortly before filing the Complaint.  (Cmplt. (Dkt. No. 1) ¶ 197)

---

exacted by the statute.  It is invalid even then to the extent of the conflict, and no farther.  The statute reads itself into the contract, and displaces inconsistent terms.") (internal citations omitted); Hopkins v. Conn. Gen. Life Ins. Co., 225 N.Y. 76, 82 (1918) ("No corporation issuing a policy may escape liability because of its failure to obey the law.").

Inquiry notice is triggered when "'a person of ordinary intelligence would consider it "probable" that fraud had occurred.'" Koch, 699 F.3d at 151 n.3 (quoting with approval Koch v. Christie's Int'l PLC, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011)); see also LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003) ("'[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises.'" (quoting Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993))).

"Inquiry notice imposes an obligation of reasonable diligence." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 362 (2d Cir. 2013). "The inquiry as to whether a plaintiff could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred[.]" Sargiss v. Magarelli, 12 N.Y.3d 527, 532 (2009) (citation and internal quotation marks omitted) (alteration in original).

"[T]he date on which knowledge of a fraud will be imputed to a plaintiff can depend on the plaintiff's investigative efforts. If the plaintiff makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the date the duty arose." Cohen, 711 F.3d at 361-62 (internal quotation marks and citations omitted); see also Koch, 699 F.3d at 155 ("New York law recognizes . . . that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation.") (citation omitted). "[I]f some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." Cohen, 711 F.3d at 362 (brackets, quotation marks, and citations omitted).

"Although determining whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss, [the Second Circuit] ha[s] found dismissal appropriate where the facts needed for determination of when a reasonable plaintiff of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers integral to the complaint," id. (alterations, quotation marks, and citations omitted), as well as from matters of which judicial notice may properly be taken.  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008); see also id. at 427 ("Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.") (citation omitted).

"[I]t is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued."  Koch, 699 F.3d at 155-56 (citation omitted).  Accordingly, "where the facts would suggest the probability of fraud to a reasonably intelligent person, failure to investigate will prove fatal to the plaintiff's claim if such a claim is not brought within the statutory limitations period beginning from the time of such inquiry notice."  Id. at 156.  "Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard."  Staehr, 547 F.3d at 427 (citations omitted).

Here, the Complaint asserts that "none of the Plaintiffs discovered the fraud until shortly before the filing of this action and there is no evidence that any other members of the Class have ever discovered the fraud."  (Cmplt. (Dkt. No. 1) ¶ 197)  Accordingly, the relevant date for purposes of determining timeliness is the date on which Plaintiffs' duty to inquire arose.  Cohen, 711 F.3d at 361-62.

26

The Complaint lists five "false statements of material facts" whereby "Defendants, expressly or impliedly, and falsely, represented that the [p]olicies under which coverage would be provided to Plaintiffs and the Class pursuant to the HealthExtras Program were legal under New York law, not against public policy, were issued to real, valid and eligible policyholders, were not void <u>ab initio</u> or voidable, provided real and valuable insurance coverage, and Defendants would pay claims falling within the terms of the purported [p]olicies without first being sued. . . ."  (Cmplt. (Dkt. No. 1) ¶ 189)

The Complaint also lists seven omissions, four of which turn on various provisions of New York insurance law.  (<u>Id.</u> ¶ 190)  The three remaining omissions are (1) "that HealthExtras created and all Defendants participated in programs pursuant to which unsuspecting credit card holders and others were targeted for what appeared to be beneficial low cost coverage under group and/or blanket accident and health insurance policies"; (2) "that the coverage purchased by Plaintiffs and the Class members had not been reviewed or vetted by any eligible entity or group with a vested interest in [e]nsuring the quality, fairness and merits of such coverage"; and (3) "that HealthExtras and the other Defendants agreed that claims falling within the terms of the purported [p]olicies would not be paid without the claimants first filing suit."  (<u>Id.</u>)

As discussed above, inquiry notice is triggered when the plaintiff "could with reasonable diligence have discovered [the fraud] . . . [which] turns on whether the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred."  <u>Sargiss</u>, 12 N.Y.3d at 532 (third alteration in original) (citations and internal quotation marks omitted). Accordingly, a court must determine whether and when a plaintiff possessed "knowledge of [the] facts" underlying the fraud.  <u>Id.</u>

Here, except for the three omissions regarding the "target[ing]" of cardholders, the lack of "vett[ing]," and the alleged agreement that claims "would not be paid," the misrepresentations and omissions giving rise to Plaintiffs' fraud claims all flow from the alleged restrictive coverage terms and the alleged illegality of the policies under New York law. (Cmplt. (Dkt. No. 1) ¶¶ 189-90)

Plaintiffs contend that (1) they had no duty to inquire as to whether the trust holding the policies was "a group legally entitled to hold blanket or group health and accident insurance"; and (2) the policies' marketing materials did not otherwise trigger a duty of inquiry. (Pltf. Opp. Br. (Dkt. No. 168) at 26-27)  As discussed above, however, Plaintiffs concede that by 2005 they had received the insurance policies, which included coverage descriptions, and that "legalese in Defendants' marketing materials disclosed that Stonebridge's Policy was issued to a trust. . . ."  (Id. at 26, 35 (citing Cmplt. (Dkt. No. 1) ¶¶ 77-78, 84-85, 90-91)) Accordingly, by 2005, Plaintiffs had access to "the extremely restrictive coverage [terms] of the [policies]" and knew "that the Stonebridge Policy had been issued to a trust."  (Id. at 27)

Given (1) the admission that, as of 2005, Plaintiffs knew of the alleged improper issuance of the policies to a trust and of the "extremely restrictive coverage [terms] of the [policies]"; and (2) the Complaint's allegations that the policies had been issued to ineligible entities, including the AIG Group Insurance Trust (Cmplt. (Dkt. No. 1) ¶¶ 3, 62, 106), did not include certain provisions required under the New York Insurance Law (id. ¶¶ 3, 69, 112), and offered coverage that was illusory (id. ¶¶ 113-18), the Court concludes that Plaintiffs were on inquiry notice as of 2005.

Moreover, knowledge of the facts alleged in the Complaint would have caused a reasonable person of ordinary intelligence – as of 2005 – to inquire further about whether a

fraud had been perpetrated.  And such an inquiry would have naturally led to discovery of the other alleged omissions in the policies.  Accordingly, Plaintiffs' fraud claims accrued no later than 2005, and expired no later than 2007 – eight years before the filing of the Complaint.

Citing Quast v. Fidelity Mut. Life Ins. Co., 226 N.Y. 270 (1919), Plaintiffs contend that "insureds . . . have no duty to inquire as to the legality of the insurance coverage they receive."  (Pltf. Opp. Br. (Dkt. No. 168) at 26)  Quast does not address a fraud claim, however, much less when a fraud claim accrues for purposes of the statute of limitations.  In Quast, plaintiff sought to recover the cash value of an insurance policy.  The defendant insurer attempted to evade liability by arguing that the policy was void under Pennsylvania law.  The court held that the insurer could not escape liability by claiming that the policy it had issued was void.  Quast, 226 N.Y. at 272, 279, 283.  Quast has no application here.

Plaintiffs further contend that "the mere fact that the [policies] had been issued to a trust did not put Plaintiffs on inquiry notice that such trust was not a group legally entitled to hold blanket or group health and accident insurance[,]" because "[t]he identity or significance of the group master policyholder would not resonate with any lay insured."  (Pltf. Opp. Br. (Dkt. No. 168) at 27)  As to their awareness of the coverage terms, Plaintiffs assert that this knowledge "could not have put Plaintiffs on inquiry notice that the [policies were] illegal. . . ." (Id.)  These arguments are not persuasive.

"It is knowledge of facts[,] not legal theories[,] that commences the running of the two-year limitations period."  TMG-II v. Price Waterhouse & Co., 175 A.D.2d 21, 23 (1st Dept. 1991) (citation omitted).  "[T]he legal rights that stem from certain facts or circumstances need not be known, only the facts or circumstances themselves."  Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir. 1992) (citations omitted).  Moreover, "'a plaintiff need not know each and

every relevant fact of his injury or even that the injury implicates a cognizable legal claim.

Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical

facts of injury and causation to protect himself by seeking legal advice.'"  Statistical Phone

Philly, 116 F. Supp. 2d at 481 (quoting Kronisch v. United States, 150 F.3d 112, 121 (2d Cir.

1998)); see also Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp., No. 13 Civ. 291

(CM), 2014 WL 3728591, at *11 (S.D.N.Y. July 28, 2014), aff'd, 624 F. App'x 23 (2d Cir.

2015) ("For statute of limitations purposes, the issue is not whether a plaintiff obtains all of the

facts regarding the alleged fraud, but rather whether he or she had 'constructive notice of facts

sufficient to create a duty to investigate further into the matter.'" (quoting In re Integrated Res.,

Inc. Real Estate Ltd. P'ships Sec. Litig., 851 F. Supp. 556, 567 (S.D.N.Y. 1994))); Addeo v.

Braver, 956 F. Supp. 443, 450 (S.D.N.Y. 1997) ("For purposes of determining whether

plaintiffs were under a duty to investigate, then, the question is not whether the materials

suggested the full extent of defendant's deceit; the question is whether the materials suggested

that there were any material misrepresentations.  To the extent that there was such a suggestion,

plaintiffs were left with a duty to inquire. . . . If they failed in this respect, they must be held to

[have] had constructive knowledge not merely of those facts directly implicated on the face of

the materials available to them, but also of any information that would have come to light

during the course of a reasonable investigation.") (citation omitted).

And where fraud claims are premised on contract or policy terms, inquiry notice

is triggered once the plaintiff receives the document or documents containing the allegedly

fraudulent terms.  See, e.g., Yesa LLC v. RMT Howard Beach Donuts, Inc., 222 F. Supp. 3d

181, 189-91 (E.D.N.Y. 2016) (plaintiff alleged fraud, claiming that she had been duped into

signing a consulting agreement, did not read the agreement or understand its import, and was

later denied copies of the fully executed agreement; held that inquiry notice was triggered when plaintiff entered into the consulting agreement, because "the material terms of that agreement were more than sufficient to put a person of ordinary intelligence on inquiry notice of the facts supporting a fraud claim"); Sheth v. N.Y. Life Ins. Co., 308 A.D.2d 387, 387 (1st Dept. 2003) ("the contracts signed by plaintiffs at the time of their hiring, had they been read by plaintiffs as they could have been, would have clearly apprised them" of provisions on which their fraud claims were premised); see also Standard Sec. Life Ins. Co. of N.Y. v. Berard, 684 F. App'x 56, 58-60 (2d Cir. 2017) (summary order) (affirming district court's finding that defendant's fraud counterclaim, which was based on allegations that plaintiff "persuaded him to execute release and repayment agreements by misrepresenting his insurance-policy obligation to make repayment," accrued when defendant obtained access to the insurance policy and release and repayment agreements at issue).

   Here, Plaintiffs knew by 2005 that the policies had been issued to a trust, and provided "extremely restrictive coverage" that was, in essence, illusory. Accordingly, by 2005, Plaintiffs were in possession of "'enough of the critical facts of injury and causation'" to create a duty to investigate. Statistical Phone Philly, 116 F. Supp. 2d at 481 (quoting Kronisch, 150 F.3d at 121)). Had Plaintiffs undertaken a reasonable investigation, they could have discovered the alleged violations of the New York Insurance Law. Because Plaintiffs did not perform any investigation, they are charged with that knowledge. See Foxley v. Sotheby's Inc., 893 F. Supp. 1224, 1231 (S.D.N.Y. 1995) ("Once [a] plaintiff has notice of the fraud, '[he] is charged with whatever knowledge an inquiry would have revealed.'" (quoting Stone, 970 F.2d at 1049) (second alteration in Foxley)).

In an effort to salvage their fraud claims, Plaintiffs assert the same arguments they made with respect to the timeliness of their GBL claims:  continuing violation, equitable tolling, and voidness.  (Pltf. Opp. Br. (Dkt. No. 168) at 21-25)  Those arguments fail for reasons already explained.

Because Plaintiffs' fraud claims are time-barred, Stonebridge's motion to dismiss those claims will be granted.

C.     **Unjust Enrichment Claim**

As discussed above, under New York law, a six-year limitation period applies to "an action for which no limitation is specifically prescribed by law."  N.Y. C.P.L.R. § 213(1). Unjust enrichment is such an action.  See Cohen, 711 F.3d at 364 ("Under New York law, [there is a] six [] year limitations period for unjust enrichment [claims.]"); Schandler v. N.Y. Life Ins. Co., No. 09 CIV. 10463 LMM, 2011 WL 1642574, at *9 (S.D.N.Y. Apr. 26, 2011) ("The statute of limitations in New York for a claim of unjust enrichment is six years[.]" (citing Golden Pac. Bancorp v. Fed. Deposit Ins. Corp., 273 F.3d 509, 518, 520 (2d Cir. 2001); N.Y. C.P.L.R. § 213(1))).

Stonebridge argues, however, that "the substance of plaintiffs' quasi-contract claims depends upon predicate violations of the Insurance Law," and that accordingly C.P.L.R. "§ 214(2)'s three-year period applicable to statutory violations should control."  (Def. Br. (Dkt. No. 167) at 21) (citations omitted)  As is also discussed above, this three-year limitations period applies to "an action to recover upon a liability, penalty or forfeiture created or imposed by statute. . . ."  N.Y. C.P.L.R. § 214(2).

The Insurance Law provisions at issue here do not create or impose any liability, penalty, or forfeiture.  Instead, they provide a potential basis for rendering the policies voidable. See Dornberger v. Metro. Life Ins. Co., 961 F. Supp. 506, 533 (S.D.N.Y. 1997) ("[W]here one

of the parties to an illegal contract is innocent of wrongdoing, courts have allowed such party to

seek relief in the form of rescission based on the illegal conduct of the other party to the

agreement.") (citations omitted).  Accordingly, the Court concludes that the six-year statute of

limitations applies to Plaintiffs' unjust enrichment claim.

The parties dispute when Plaintiffs' unjust enrichment cause of action accrued

such that the six-year limitations period began to run.

In its motion to dismiss, Stonebridge contends that Plaintiffs' unjust enrichment

claim "accrued 'upon the occurrence of the wrongful act giving rise to a duty of restitution and

not from the time the facts constituting the fraud [were] discovered.'"  (Def. Br. (Dkt. No. 167)

at 22 (quoting Cohen, 711 F.3d at 364))  According to Stonebridge, "[t]he alleged wrongful act

giving rise to the duty of restitution is that Stonebridge 'sold insurance coverage' to plaintiffs."

(Id. (quoting Cmplt. (Dkt. No. 1) ¶ 159))

Plaintiffs counter that "when a plaintiff makes a series of payments to a

defendant which unjustly enriches the defendant, a separate cause of action accrues for each

payment."  (Pltf. Opp. Br. (Dkt. No. 168) at 30 (citing First Nat'l City Bank v. N.Y.C. Fin.

Admin., 36 N.Y.2d 87, 93 (1975) (hereinafter "City Bank"))  According to Plaintiffs, they "may

recover, at a minimum, all payments they made within six years prior to filing this suit."  (Id. at

29)

"The statute of limitations for a claim of unjust enrichment begins to run 'upon

the occurrence of the wrongful act giving rise to a duty of restitution.'"  Golden Pac. Bancorp,

273 F.3d at 520 (quoting Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp., 192

A.D.2d 501, 503 (2d Dept. 1993)); see also Indovino v. Tassinari, No. CV-05-4167 JS AKT,

2006 WL 2505232, at *4 (E.D.N.Y. Aug. 28, 2006) ("A cause of action for monies had and

received accrues at the same time as a claim for unjust enrichment." (citing <u>Onanuga v. Pfizer, Inc.</u>, 369 F. Supp. 2d 491, 500 (S.D.N.Y. 2005)).[9]

Here, Plaintiffs allege that Stonebridge was unjustly enriched because it "sold insurance coverage to Plaintiffs . . . that was illegal, against public policy, and void <u>ab initio</u> . . . ." (Cmplt. (Dkt. No. 1) ¶ 159)  In other words, the alleged wrongful act that provides the basis for Plaintiffs' unjust enrichment claim is the sale of the allegedly illegal insurance policies to Plaintiffs.

Plaintiffs argue, however, that an unjust enrichment claim does not accrue "until the defendant has received the money from the plaintiff[,] . . . mean[ing] that . . . a separate cause of action accrues for each payment." (Pltf. Opp. Br. (Dkt. No. 168) at 29-30) (citation omitted)  This argument is not persuasive.  While an unjust enrichment claim may be premised on payments of money to a defendant, such payments are not a prerequisite for an unjust enrichment claim.  A plaintiff need only show that the defendant received a benefit or was enriched at the plaintiff's expense.  <u>See</u> <u>Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc.</u>, No. 16-CV-9576 (KMK), 2019 WL 4688628, at *11 (S.D.N.Y. Sept. 25, 2019) ("To state a claim for unjust enrichment, a party must demonstrate '1) [the] defendant was enriched; 2) [the] defendant's enrichment came at [the] plaintiff's expense; and 3) circumstances were such that in equity and good conscience [the] defendant should compensate [the] plaintiff.'" (quoting <u>Shamrock Power Sales, LLC v. Scherer</u>, No. 12-CV-8959 (KMK), 2015 WL 5730339, at *31 (S.D.N.Y. Sept. 30, 2015)) (alterations in <u>Tech. Opportunity Grp.</u>)); <u>Wells Fargo Bank, N.A. v. Burke</u>, 155 A.D.3d 668, 671 (2d Dept. 2017) ("'The essence of unjust enrichment is that one

---

[9]  In asserting their quasi-contract claim, Plaintiffs reference both unjust enrichment and monies had and received.  (<u>See</u> Cmplt. (Dkt. No. 1) ¶¶ 4, 151; <u>id.</u> at 59)

party has received money or a benefit at the expense of another.'" (quoting <u>City of Syracuse v.</u>

<u>R.A.C. Holding</u>, 258 A.D.2d 905, 906 (4th Dept. 1999))).

       Moreover,

> any increase in wealth – even if unrealized or illiquid – is an enrichment.  If the
> enrichment is unjust, then the enrichment is immediately actionable.  While
> authorities tend to "refer[] for simplicity to receipt of a 'payment,' because the
> reported cases, nearly without exception, involve disputes over the payment of
> money," Restatement (3d) of Restitution and Unjust Enrichment § 48 cmt. a,
> nevertheless[,] . . . an enrichment is actionable even when the enrichment is not
> realized as money until years later.

<u>JPMorgan Chase Bank, N.A. v. Maurer</u>, No. 13 Civ. 3302(NRB), 2015 WL 539494, at *6

(S.D.N.Y. Feb. 10, 2015).

       Here – accepting the Complaint's allegations as true – Stonebridge was enriched

at Plaintiffs' expense when it sold the allegedly illegal insurance policies to Plaintiffs.

Plaintiffs' unjust enrichment claim accrued at that point.

       <u>Schandler v. N.Y. Life Ins. Co.</u> – which involves nearly identical circumstances

– is instructive.  There, the plaintiff "allege[d] that the Defendants profited at her expense by

collecting premiums from her for a promise to provide her with 'broad convalescent care

coverage' when in reality, Defendants provided her with a policy that offered limited coverage."

<u>Schandler</u>, 2011 WL 1642574, at *9.  Although Schandler paid premiums under this policy until

2007, the court concluded that her unjust enrichment claim accrued "at the latest in November

2002 when the Major Medical Plan, which contained terms that 'expressly contradicted'

Defendants' alleged promises, took effect."  <u>Id.</u> at *2, 9; <u>see also</u> <u>Pricaspian Dev. Corp. (Tex.)</u>

<u>v. Royal Dutch Shell, PLC</u>, 382 F. App'x 100, 103-04 (2d Cir. 2010) (summary order)

(addressing unjust enrichment claim; "Here, it is alleged that the <u>wrongful act</u> that eventually

gave rise to a duty of restitution occurred on June 9, 1993, when, after going behind [plaintiff's]

back, [defendant] entered into the 'Preliminary Consortium Agreement' directly with the

government of Kazakhstan, without the participation of [plaintiff], calling for [defendant] to

make payments to the government of Kazakhstan and undertake geological studies in exchange

for exploration and production rights.  That the value of the restitution owed would not be

known until profits began flowing from the Kazak oil fields does not change the date of the

wrongful act that gave rise to the underlying duty of restitution.") (emphasis in original);

Golden Pac. Bancorp, 273 F.3d at 520 (unjust enrichment claim accrues "'upon the occurrence

of the wrongful act giving rise to a duty of restitution'" (quoting Congregation Yetev Lev

D'Satmar, 192 A.D.2d at 503); Fero v. Excellus Health Plan, Inc., 502 F. Supp. 3d 724, 736-37

(W.D.N.Y. 2020) (where plaintiffs alleged that defendants materially misrepresented data

privacy and security practices, unjust enrichment claim accrued not when data breach occurred,

but when defendants "fail[ed] to use any part of the 'premiums for health insurance and health

benefits services that Plaintiffs and Class Members paid . . . to pay for the administrative costs

of reasonable data privacy and security practices and procedures[,] . . . [which was] well before

the data breach"); Dist. Attorney of N.Y. Cty., 307 F. Supp. 3d at 201-02 ("[T]he gravamen of

the Republic's pleadings is the misappropriation of public funds by Mr. and Mrs. Marcos in the

1970s and 1980s.  Under the Republic's theory, any further enrichment or payments – for

example, from the sale of the painting – stemmed from the initial misappropriation, and must

therefore be considered derivative of the initial theft.  Accordingly, the Republic's

misappropriation, unjust enrichment, and money had and received claims . . . began to run at the

time of the alleged misappropriation of public funds."); Maurer, 2015 WL 539494, at *6-7

(plaintiff alleged that rights in an IRA account were unlawfully assigned to certain beneficiaries;

held that plaintiff's unjust enrichment claim accrued not when the beneficiaries received payments from the IRA, but when these beneficiaries became eligible to receive payments).

City Bank, cited by Plaintiffs (Pltf. Opp. Br. (Dkt. No. 168) at 29-30), is not on point. There, the plaintiff bank asserted "causes of action for moneys had and received . . . as it paid under protest . . . taxes unlawfully and unconstitutionally imposed upon it[.]" City Bank, 36 N.Y.2d at 93. The New York Court of Appeals concluded that "[t]he bank's causes of action for moneys had and received accrued as it paid under protest [the taxes at issue]," because the alleged wrongful act was the unlawful imposition of those taxes. Id. Here, by contrast, the wrongful act alleged in the Complaint is the sale of illegal insurance policies to Plaintiffs, not the manner in which the premium obligation under the policies was imposed.

The Court concludes that Plaintiffs' unjust enrichment cause of action accrued in 2000, when the allegedly illegal policies were sold to Plaintiffs. Because the Complaint was filed in 2015 – long after the applicable six-year statute of limitations period had expired – the claim is time-barred. Accordingly, Stonebridge's motion to dismiss Plaintiffs' unjust enrichment claim will be granted.[10]

_____

[10] As with their GBL and fraud claims, Plaintiffs contend that their unjust enrichment claim is timely pursuant to the continuing wrong doctrine and equitable tolling, and because the policies constitute void contracts. (Pltf. Opp. Br. (Dkt. No. 168) at 21-25) These arguments fail for the same reasons set forth above. The continuing wrong doctrine does not apply to Plaintiffs' unjust enrichment claim because that claim is premised on the sale of allegedly illegal insurance policies in 2000, and the premiums Plaintiffs paid under the policies represent only "'the continuing effects of earlier unlawful conduct.'" Miller, 979 F.3d at 122 (quoting Salomon, 174 A.D.3d at 721). Equitable tolling likewise does not render the claim timely, because Plaintiffs were in possession of the documents revealing the violations of the New York Insurance Law on which their unjust enrichment claim is premised, and a duty to investigate was triggered, no later than 2005. With reasonable diligence, Plaintiffs could have discovered the New York Insurance Law violations asserted in the Complaint, but Plaintiffs did not perform any inquiry after receiving the policies. See Int'l Bhd. of Teamsters, 2012 WL 13202126, at *13-14 (equitable tolling not applicable to unjust enrichment claim where complaint "contain[ed] no allegations that plaintiffs . . . exercised any diligence whatsoever to discover the facts

## <u>CONCLUSION</u>

Stonebridge's motion to dismiss is granted.  The Clerk of Court is directed to terminate the motion (Dkt. No. 166) and to close this case.

Dated: New York, New York
      July 26, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

surrounding . . . recall [of allegedly defective medical testing kits]," despite "disclosures concerning the test kits [which] triggered an obligation to inquire into the matter").